UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| 3BTECH, INC., <br><br> Plaintiff, <br><br> v. <br><br> JIE WANG, <br><br> Defendant. | Case No. 3:20-CV-637 JD |

**OPINION AND ORDER**

Plaintiff 3BTech sued Defendant Jie Wang alleging Ms. Wang used her position as a 3BTech accounting manager to embezzle nearly $2 million from it and two related companies. Ms. Wang moved to dismiss the lawsuit, arguing the sole federal claim 3BTech raised was implausible and that the remaining claims were outside the Court's subject matter jurisdiction because 3BTech and the two related companies colluded to create diversity jurisdiction. The Court, in a prior order, granted Ms. Wang's motion to dismiss in part, finding the federal claim was implausible. It now turns in this order to consider whether the remaining claims must be dismissed for lack of subject matter jurisdiction. For the following reasons, the Court grants the remainder of Ms. Wang's motion.

**I. Statement of Facts**

Plaintiff 3BTech, Inc., a technology services company that is incorporated and has its principal place of business in Indiana, is litigating this case to recover damages for what it claims were impermissible transfers Defendant Jie Wang, a California citizen, made from 3BTech and two related companies to herself in July 2020. Ms. Wang was employed as an accounting manager with 3BTech at the time of the allegedly illicit transfers and had also just begun

contentious divorce proceedings with 3BTech President Jianqing Zhu. (DE 13 at 2; DE 36 at 2–3.)

When 3BTech first filed a complaint in this case on July 30, 2020, it did so with one of the related companies, DC 3B LLC, as co-plaintiff, and named Ms. Wang and her California divorce lawyer as co-defendants. (DE 1.) 3BTech uses DC 3B to hold real estate. (DE 13 ¶ 16.) 3BTech and DC 3B alleged Ms. Wang impermissibly transferred $1.6 million directly from DC 3B to her family trust and then transferred $1.58 million of that amount from her family trust to her personal bank account. (DE 1 ¶¶ 21, 22.) The two companies alleged seven causes of action in the complaint, one of which was a violation of a federal statute governing bank insider fraud and the other six were based in state law. (DE 1 ¶¶ 34–71.) 3BTech and DC 3B asserted the Court had subject matter jurisdiction because the complaint alleged a violation of federal statute, which raised a federal question. (DE 1 ¶ 4.) The Plaintiffs did not allege diversity jurisdiction and did not plead DC 3B's citizenship. (DE 1 ¶ 9.)

On August 3, this Court issued an order questioning whether 3BTech and DC 3B's federal claim was substantial enough to invoke federal question jurisdiction. (DE 10.) The Court noted that the federal statute underlying the claim appeared to apply only to bank insiders and pointed out that the Plaintiffs had not alleged Ms. Wang was a bank insider at the time of her transfers. 3BTech and DC 3B were thus directed to make a choice: if they wanted to continue to claim federal question jurisdiction, they had to explain why federal question jurisdiction existed; and if they wanted to allege diversity jurisdiction, they had to file an amended complaint properly pleading diversity jurisdiction. (DE 10 at 2.)

On August 7, 3BTech filed an amended complaint against Ms. Wang (DE 13) as well as a supplement in support of jurisdiction (DE 14). The amended complaint dropped DC 3B as a co-

plaintiff and dropped Ms. Wang's divorce lawyer as a co-defendant. It maintained the prior pleading of federal question jurisdiction but also alleged, for the first time, diversity jurisdiction. (DE 13 ¶¶ 8–9.) The amended complaint also added new allegations of wrongdoing against Ms. Wang. In addition to the $1.6 million she was already alleged to have transferred from DC 3B, 3BTech now claimed she had also transferred $200,000 from 3BTech to a third related company, Hoverzon LLC, and then from Hoverzon to her family trusts. (DE 13 ¶ 42.) 3BTech also said it believed Ms. Wang used $32,500 of 3BTech's funds for legal expenses and for transfers to her personal trusts (DE 13 ¶ 79) as well as generally seized control of corporate records, corporate checkbooks, and bank fobs in the process (DE 13 ¶ 4).

3BTech made an effort to explain the changes that had taken place between the filing of the original complaint and the filing of the amended complaint. It stated that upon discovering Ms. Wang's additional malfeasance connected to itself and Hoverzon, it, DC 3B, and Hoverzon,

> collectively assessed their individual damages, performed an accounting of the damages DC 3B LLC and Hoverzon LLC incurred at the hands of [Ms. Wang], and resolved all disputes and claims between the three entities through an assignment of all claims by DC 3B LLC and Hoverzon LLC against Ms. Wang to 3BTech for the purposes of settling liability among the three entities, streamlining future costs of litigation against Ms. Wang, and enabling recovery of unified damages by 3BTech against Ms. Wang.

(DE 13 ¶ 7.) 3BTech added to its explanation later in the complaint stating that DC 3B and Hoverzon's assignment of litigation rights to 3BTech was also, in part, "for the purpose of a singular recovery to be equitably distributed to each of the entities." (DE 13 ¶ 50.) The amended complaint kept the same seven causes of action from the original complaint but added additional information for each existing claim describing Ms. Wang's newly discovered wrongdoing and the subsequent assignment of rights between the companies.

Ms. Wang subsequently moved to dismiss 3BTech's amended complaint (DE 35). She argues the Court should dismiss the remaining state law claims for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), because the series of events and language in the amended complaint suggests 3BTech, a diverse entity, improperly colluded with DC 3B and Hoverzon, both non-diverse entities, to keep this case in federal court even if the federal claim failed. (*Id.* at 1–2.) 3BTech denies that it colluded with the other companies to establish diversity jurisdiction.

**II. Standard of Review**

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of claims over which the Court lacks subject matter jurisdiction. If a jurisdictional challenge under 12(b)(1) only contests the sufficiency of the plaintiff's allegations regarding subject matter jurisdiction, the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). If, however, the jurisdictional challenge denies or contests the truth of the plaintiff's jurisdictional allegations, the Court may look beyond the pleadings and view whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). The burden of establishing proper federal subject matter jurisdiction rests on the party asserting it, which for purposes of this motion is the Plaintiff, 3BTech. *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010).

**III. Discussion**

Ms. Wang contests the truth of 3BTech's jurisdictional allegations, arguing that even though she and 3BTech are diverse parties on the face of the amended complaint, the allegations within the complaint hide that 3BTech, DC 3B, and Hoverzon colluded to ensure diversity jurisdiction by having non-diverse DC 3B and Hoverzon assign their litigation rights to diverse 3BTech. (DE 36 at 11–12.) 3BTech adamantly denies any collusion. It stands behind the reasons it gave in its amended complaint for the assignments, namely that it, DC 3B, and Hoverzon discovered more of Ms. Wang's wrongdoing after it and DC 3B filed the original complaint and that the three companies ultimately decided it was most practical to assign their claims to one party, ultimately 3BTech, for litigation purposes. (DE 45 at 9.) Because Ms. Wang has contested the truth of 3BTech's jurisdictional allegations, the Court looks beyond the pleadings and considers the parties' submitted evidence to resolve the dispute. *Apex Dig.*, 572 F.3d at 443–44.

Before parsing through the evidence to determine whether the parties colluded though, the Court must first address a threshold issue. During the parties' briefing on the motion to dismiss, it became clear the parties disagreed about DC 3B's citizenship because they dispute Jianqing Zhu's citizenship. Mr. Zhu is a member of DC 3B (DE 13 ¶ 27) and his citizenship thus determines DC 3B's citizenship because DC 3B is a limited liability company. *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992 (7th Cir. 2007). He is also a member of Hoverzon LLC (DE 13 ¶ 44) and although the parties did not argue over Hoverzon's citizenship, determining Hoverzon's citizenship is also important to the parties' overall collusion dispute. Ms. Wang argues that she and Mr. Zhu are both California citizens, which in turn means DC 3B is a California citizen and had to be dropped as a co-plaintiff so that 3BTech could assert diversity jurisdiction in the amended complaint against her. (DE 36 at 3.) 3BTech argues Mr. Zhu is an Indiana citizen, meaning DC 3B would not have destroyed diversity if it had remained a plaintiff

5

and that there was no reason to collude to get diversity jurisdiction. (DE 45 at 6.) Because determining Mr. Zhu's citizenship is essential to determining whether there is collusion, the Court resolves the citizenship dispute before proceeding.

### A. Mr. Zhu's citizenship

A court considering citizenship for diversity jurisdiction purposes determines each party's citizenship at the time the action was filed, *Perry v. Pogemiller*, 16 F.3d 138, 139 (7th Cir. 1993); *see also Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957), which in this case was July 30, 2020. An individual's citizenship corresponds to the place where the individual is domiciled. *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992) (per curium). Domicile is different than residency and corresponds to "the place one intends to remain." *Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002). Intent for diversity purposes "is a state of mind which must be evaluated through the circumstantial evidence of a person's manifested conduct." *Sadat v. Mertes*, 615 F.2d 1176, 1181 (7th Cir. 1980) (internal quotations omitted). Of course, "statements of intent are entitled to little weight when in conflict with the facts." *Id.*

There is no one factor that determines domicile. Instead, finding an individual's domicile requires a fact-based analysis that considers things like the individual's current residence, family ties, location of belongings and personal property, place of employment, ties to the surrounding community, location of financial accounts, and tax payments. *See Sadat*, 615 F.2d at 1181; *Strabala v. Zhang*, 318 F.R.D. 81, 97 (N.D. Ill. 2016). Further, there is a presumption that favors an individual's established domicile over a newly acquired one. *24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.*, 2008 WL 4671748 *4 (N.D. Ill. Oct. 21, 2008) (discussing four factors: 1) physical abandonment of the first domicile; 2) intention not to return; 3) physical

presence in the new domicile; and 4) intent to make that his domicile). Neither party requested an evidentiary hearing on Mr. Zhu's citizenship. Instead, 3BTech submitted evidence of Mr. Zhu's citizenship in its response to the motion to dismiss (DE 45) and Ms. Wang submitted evidence of Mr. Zhu's citizenship in her reply to the motion (DE 46). The Court then afforded both parties additional opportunities to submit citizenship evidence when it allowed 3BTech to file a surreply to the motion (DE 65) and Ms. Wang to file a response to the surreply (DE 69). (DE 63.) Both parties used those opportunities to present the Court with substantially more citizenship evidence, which satisfied the Court that each party had been given a fair opportunity to submit any evidence it felt was relevant, that there was sufficient evidence for the Court to reach a well-reasoned conclusion, and that a further evidentiary hearing was not necessary.

Both parties submitted a variety of evidence seeking to tie Mr. Zhu to either Indiana or California. 3BTech, arguing Mr. Zhu was domiciled in Indiana, submitted: a November 2020 affidavit from Mr. Zhu stating his "intent to remain a citizen of Indiana" (DE 65-1); a copy of Mr. Zhu's Indiana driver's license (DE 65-2); a copy of Mr. Zhu's 2019 tax return (DE 65-3); and a copy of an energy bill for a residence in Granger, Indiana, that Mr. Zhu states in his affidavit he is currently renting (DE 65-4). Ms. Wang, in support of her argument that Mr. Zhu is domiciled in California, submitted: an affidavit of her own stating Mr. Zhu lived with her and their children in California for four years before the start of the divorce proceedings (DE 69-1); a copy of an August 2020 filing from their California divorce proceedings in Orange County signed by Mr. Zhu attesting to California residency (DE 47-1); evidence that the residential address listed on Mr. Zhu's 2019 tax return is an industrial building (DE 47-2; 47-3); a copy of a court filing showing Mr. Zhu signed up for a year-long batterer's intervention program in California in December 2020 (DE 69-3); a geo-tagged picture from an address in Irvine,

California, of a suit jacket Mr. Zhu wanted Ms. Wang to provide the matching pants for (DE 69-4); a December 2020 check from Mr. Zhu with the same Irvine address listed on it (DE 69-5); a document sent to Mr. Zhu from U.S. Citizenship and Immigration Services at the Irvine address in November 2020 (DE 69-6); and a signed statement of personal history that Mr. Zhu sent to the U.S. Small Business Administration in May 2020 (DE 69-7). After weighing this evidence, the Court concludes Mr. Zhu was a citizen of California when this case began. *See Perry*, 16 F.3d at 139.

To start, the evidence shows Mr. Zhu was a resident of California when this lawsuit was filed and had been for several years. Two pieces of evidence from Ms. Wang provide the primary support for that conclusion. The first is the filing from the divorce court in Orange County, California that Mr. Zhu signed on August 7, 2020, about a week after this case began, under penalty of perjury. (DE 47-1.) In that document, Mr. Zhu checked a box indicating he "has been a resident of [the] state for at least six months and of [the] county for at least three months immediately preceding the filing" of the document. (DE 47-1 at 1, 4.) The second is a statement of personal history Mr. Zhu sent to the SBA on May 26, 2020, which he again signed acknowledging a penalty for false statements. In that document, he indicated that, as of that date, he had been a continuous resident of California since January 1, 2017. (DE 69-7 at 1.) Taken together, the two signed documents suggest Mr. Zhu had been a resident of California for more than three years at the time this case was filed.

None of 3BTech's submitted evidence convinces the Court otherwise. Problematically for 3BTech, a good amount of its evidence centers on Mr. Zhu's activities either after July 30, 2020, or never gives a specific period of time when what it purports to show occurred. The strongest pieces of evidence from 3BTech that directly pertain to Mr. Zhu's residence before the

case was filed are Mr. Zhu's driver's license and Mr. Zhu's 2019 tax return. While both initially appear to support a finding of Indiana residency, the Court ultimately affords them less weight than the materials Ms. Wang provided. The Court discounts Mr. Zhu's driver's license because it lists the residential address Mr. Zhu said in his signed statement of personal history to the SBA he moved away from in January 2017. The license thus appears to be out of date. And the Court discounts the 2019 tax return not only because the listed residential address for Mr. Zhu and his family is different than the addresses listed on Mr. Zhu's driver's license and any other evidence either party has provided, but also because the tax return address is peculiarly the same address 3BTech stated is its principal place of business (DE 13 ¶ 13) and which a Google Maps image (DE 47-2) and zoning information (DE 47-3) confirm is not a residential address. The Court thus finds the evidence before it shows Mr. Zhu was a California resident when this case began.

But residency alone does not establish domicile, so the Court continues its analysis to explore other factors that bear on domicile. Those factors too weigh in favor of finding Mr. Zhu was a California citizen. First, Mr. Zhu has continued to use a California address for important financial and personal documents since this case began, as is shown by the copy of the check he issued in December 2020 with his California address (DE 69-5) and his receipt of mail related to his application for U.S. citizenship at the same California address in November 2020 (DE 69-6). Second, there is evidence Mr. Zhu keeps personal belongings at that California address as shown by his taking the geo-tagged picture of his suit jacket at that address. (DE 69-4.) Third, Mr. Zhu signed up for a year-long batterer's intervention program taking place in California and starting in December 2020, five months after this case began. (DE 69-3.) Finally, Mr. Zhu has family ties to California as shown by his two minor children, of whom he is seeking joint physical custody in the divorce (DE 47-1 at 2), continuing to live in California. (DE 69-1 at 2.) The evidence

before the Court also shows he has family ties in Indiana with his mother, sister, and college-aged son living in the state (DE 65-1), but the Court finds that the presence of his minor children in California and his intention to share custody of them outweighs those Indiana family ties. This evidence shows not only that Mr. Zhu resides in California but also that Mr. Zhu has manifested an intention to remain in California.

The Court does acknowledge that the factors do not all clearly point to California domicile though. Mr. Zhu has said he belongs to three organizations in the Indiana area, that his son receives in-state tuition at Indiana University, that he is currently renting and making monthly electric payments for a home in Indiana, that he is under contract to purchase a home in Indiana, and that his 2019 tax return and driver's license suggest Indiana domicile. (DE 65-1.) But the Court finds that evidence, when weighed against Ms. Wang's, is insufficient to establish Indiana domicile at the time this case was filed. Many of Mr. Zhu's ties to Indiana are supported only by his statements of intent at the time he signed his affidavit in November 2020, nearly five months after this case was filed. And even then, the statements are undermined by Ms. Wang's evidence, which shows Mr. Zhu was still undertaking important activities in California at the same time. Further, some of 3BTech's evidence gives the Court pause. In addition to the residential address issues with the tax return and driver's license noted earlier, the Court notes that the electrical payments Mr. Zhu had been making on his Indiana rental only start in September 2020 and show no usage before that time. (DE 65-4.) 3BTech has also provided no timeline for when Mr. Zhu joined the local clubs or decided to purchase a home in Indiana, which leaves the Court to wonder whether those events happened before or after this case began. Therefore, after weighing all the evidence before it, the Court finds Mr. Zhu intended to remain

in California when this lawsuit began, was thus a California citizen, and, as a member of DC 3B and Hoverzon, caused both entities to share in that citizenship.

### B. Collusion to achieve diversity jurisdiction

Having concluded the citizenship dispute, the Court now moves to consider whether 3BTech, DC 3B, and Hoverzon colluded to create diversity jurisdiction. It is well-established that courts, in certain contexts, are required to "look behind the pleadings to ensure that parties are not improperly creating . . . diversity jurisdiction." *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014). One such context is when suspicion arises that a plaintiff has created federal jurisdiction through collusive assignment of interests. *Id.* (citing *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 825–30 (1969)). Congress has made clear that "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction" of the court. 28 U.S.C. § 1359. Courts considering potential collusive assignments give the assignments "close scrutiny for signs of attempts to manipulate the choice of forum," *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 723 (7th Cir. 2012), and such scrutiny involves questions of fact, *see Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1066 (7th Cir. 1992).

The Seventh Circuit recognizes a collusive assignment as "a genuine jurisdictional problem" and treats "an assignment as collusive when its sole function is to shift litigation from state to federal court." *Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900–01 (7th Cir. 2010). A court cannot begin its analysis with the presumption that an assignment between related parties is collusive, *Herzog*, 976 F.2d at 1066–67, but can find there has been collusion between the parties if its application of "close scrutiny" to the totality of the circumstances supports such a conclusion, *Travelers*, 689 F.3d at 723; *YP Recovery Inc. v. YellowParts Eur., SL*, No. 15-cv-

3428, 2016 U.S. Dist. LEXIS 117948, at *18–19 (N.D. Ill. Sep. 1, 2016) (citing *Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1205 (10th Cir. 2014)). Although there is no bright-line test, courts have looked to seven factors to guide them in their analysis of potential collusion:

> 1. Whether the assignee of the claim lacked a prior connection to the litigation;
> 2. Whether the assignor of the claim selected the assignee's legal counsel and/or paid for the assignee's litigation expenses;
> 3. Whether the assignor retained control of the litigation;
> 4. Whether the assignee agreed to share with the assignor any portion of the recovery;
> 5. Whether the assignee provided meaningful consideration for the assignment;
> 6. Whether the timing of the assignment is suspicious; and
> 7. Whether the assignment was motivated by a desire to create diversity jurisdiction.

*See CNH Indus. Am. LLC v. Jones Lang Lasalle Ams., Inc.*, 882 F.3d 692, 702 (7th Cir. 2018); *Nat'l Fitness Holdings*, 749 F.3d at 1205; *YP Recovery*, 2016 U.S. Dist. LEXIS 117948 at *23–28 (applying the factors). The Court uses these factors to guide its analysis in this case.

### 1. Prior connection to the litigation

Both 3BTech and Ms. Wang agree that 3BTech had a prior connection to the litigation, but they disagree about whether the magnitude of 3BTech's prior connection should count in the analysis. The central dispute arises from the fact that 3BTech was an original party to the complaint but did not have a direct claim for the $1.6 million Ms. Wang transferred, which makes up the bulk of the damages at issue in both the original and amended complaints, until DC 3B allegedly assigned its litigation rights. (DE 13 ¶ 7, 65.) 3BTech did gain a more direct connection through the newly discovered wrongdoing it allegedly uncovered before filing the amended complaint, but that wrongdoing, however directly related to 3BTech, still supports only

12

a fraction of the lawsuit's claims.[1] The Court ultimately credits 3BTech for having a prior connection but minimizes the weight it gives the connection somewhat because the connection was not as strong as DC 3B's. The Court also treats 3BTech's argument that it gained a more direct connection through the newly discovered wrongdoing with some skepticism. While it is true 3BTech alleged a more direct connection between itself and the claims in the amended complaint, the Court notes that the connection is not based on any hard evidence before the Court but instead solely on 3BTech's allegations. And those allegations are the very things Ms. Wang is now challenging as pure efforts to disguise underlying collusion. Thus, the Court finds this factor weighs against collusion because 3BTech clearly had a prior connection, but finds that weight is not as strong as if DC 3B had been the assignee party.

### 2. Attorney choice and control of litigation

The Court next moves to consider the second and third factors together, as the parties did in their filings. A key consideration for courts weighing these two factors is the presence of attorney overlap between the assignor parties and the assignee parties. *See YP Recovery*, 2016 U.S. Dist. LEXIS 117948 at *25–26; *see also Boyd*, 366 F.3d at 531–32; *Nat'l Fitness*, 749 F.3d at 1206. As Ms. Wang points out (DE 36 at 9; DE 47 at 8–9), and 3BTech does not dispute (DE 45 at 8), there was attorney overlap here because the same attorneys who represented 3BTech and DC 3B in the original complaint continued to represent 3BTech after it began proceeding alone following the amended complaint. The Court determines that weighs in favor of finding

---

[1] The Court notes here that 3BTech never specifies whether it is seeking the $200,000 it alleges Ms. Wang transferred from it to Hoverzon to her own trusts as its own loss, as only Hoverzon's loss, or as a shared loss between them. Logic would dictate that Hoverzon either has a full or partial claim to the lost $200,000 though because 3BTech found it necessary to have Hoverzon assign its litigation rights before 3BTech pursued claims based on the $200,000. (DE 13 ¶¶ 50, 70.)

collusion. The Court also notes the potential for shared control and costs of litigation because 3BTech is pursuing attorney's fees in this lawsuit and has agreed that any recovery it receives, which would include any award of attorney's fees, will "be equitably distributed" between itself and the two companies. (DE 13 ¶ 50.) These facts do not conclude the collusion analysis on their own but do suggest that collusion may have occurred. Thus, the Court finds this factor, though not a strong indication of collusion, does weigh against 3BTech.

### 3. Agreement to pay portion of recovery

The Court next determines whether 3BTech has agreed to pay DC 3B and Hoverzon a portion of any recovery it obtains. 3BTech clearly has. The company specifically stated in its amended complaint that it, DC 3B, and Hoverzon "have reached a settlement and assignment of rights agreement whereby DC 3B and Hoverzon have assigned all of their rights to pursue claims against Ms. Wang to 3BTech for the purpose of a singular recovery to be equitably distributed to each of the entities." (DE 13 ¶ 50.) 3BTech did not deny the truth of that statement in its subsequent filings on the motion but instead, citing *Herzog*, argued Ms. Wang cannot "independently rely" on the agreement to share the recovery between the companies to win her collusion argument. (DE 45 at 8) (citing 976 F.2d at 1066). The Court concurs that the agreement to share any recovery doesn't solve the collusion question on its own but finds that it does weigh strongly against 3BTech's position that the companies did not collude.

### 4. Meaningful consideration

The Court next determines whether 3BTech provided DC 3B and Hoverzon meaningful consideration in exchange for their assignment of their litigation rights to 3BTech. The Court cannot find there was any meaningful consideration given. 3BTech maintains that the record,

14

two lines from two affidavits, supports a finding that there was meaningful consideration. The first affidavit is from Peggy Lin, the Interim General Manager of DC 3B, who stated that "3BTech paid DC 3B a fair and reasonable consideration." (DE 45-1.) The second is from Brett Barbour, the Interim Chief Executive Officer of 3BTech, who stated "[i]n exchange for DC 3B's assignment of rights, 3BTech paid DC 3B LLC and Hoverzon, LLC fair and reasonable consideration." (DE 45-3). The Court regards both statements as conclusory and of no help to a factual determination on this issue. *See Alexander Chem. Corp. v. G.S. Robins & Co.*, 852 F. Supp. 2d 1048, 1055 (N.D. Ill. 2012) (holding "[a]ffidavits (and testimony) set out facts, not law" and that an individual "got it backward" when he provided a legal conclusion without supporting facts); *see also Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). It is the Court's role in this analysis to determine whether the consideration given was meaningful, not the affiants, and the Court cannot fulfill that role because neither of the affiants have explained what they believe constitutes "fair and reasonable consideration." This lack of evidence is additionally concerning to the Court because 3BTech has had ample opportunity to give the Court specific information and evidence about the substance of the assignments. Instead of doing that, 3BTech was only able to give the Court two conclusory statements, which do not convince the Court that there was meaningful consideration given.

### 5. Suspicious timing of the assignment

The Court next considers whether the timing of the assignments was suspicious and finds it clearly was. When 3BTech and DC 3B began this case as co-plaintiffs, they relied solely on federal question jurisdiction to bring the case in federal court. (DE 1 at 4.) But the Court questioned the viability of the sole claim supporting that jurisdiction soon after the companies filed. (DE 10.) It was only then that 3BTech filed the amended complaint that dropped DC 3B as

a plaintiff and added diversity jurisdiction for the first time with the explanation that it had discovered additional wrongdoing since filing the complaint about a week before and agreed to have DC 3B and Hoverzon, two non-diverse companies, assign their litigation rights to it. That sequence of events, to take language from *Herzog*, certainly "emit[s] an odor of collusion." 976 F.2d at 1067. 3BTech defended the timing by pointing to its amended complaint, where it argued it gave "plausible" explanations for the series of events that have nothing to do with diversity. Namely, 3BTech stood by its explanation that the assignments were necessary to avoid infighting (DE 13 ¶ 50), settle liability among the companies, streamline future costs of litigation, and enable recovery of unified damages (*id.* ¶ 7). While the Court acknowledges 3BTech provided an explanation and considers the explanation in its overall analysis, the Court still concludes that the timing of the assignments from the two non-diverse companies to the only diverse company so close on the heels of realizing their federal question jurisdiction was potentially in jeopardy is highly suspicious and suggests collusion.

### 6. Motivation to create diversity jurisdiction

The last factor the Court considers is whether the assignment was motivated by a desire to create diversity jurisdiction. Courts weighing this factor have generally determined motive by considering which party stands as the real party in interest and which party only has a derivative interest. *See YP Recovery*, 2016 U.S. Dist. LEXIS 11798 at *28–29 (citing *Weissman v. Weener*, 12 F.3d 84, 86 (7th Cir. 1993) ("because Weissman's injuries are all derivative—they derive from the fact that A.H.L. suffered a loss—he is not the real party in interest, and therefore cannot maintain an action in his own name")); *see also Wilsey v. Eddingfield*, 780 F.2d 614, 615 (7th Cir. 1985). Here, 3BTech is clearly a real party in interest to the claims it is directly connected to, but, as the Court explained in its analysis of the first factor, 3BTech would only be able to

16

recover the bulk of the damages alleged in this lawsuit because DC 3B and Hoverzon assigned it their litigation rights. Thus, while 3BTech is a real party in interest, much of its ability to pursue this litigation derives from DC 3B and Hoverzon, which, like the first factor, lessens the weight the Court affords this factor.

***

Having thus analyzed each of the factors other courts have used in similar situations, the Court now combines its factor-based analysis with its consideration of the non-jurisdiction related reasons 3BTech gave for the assignments to ultimately conclude the three companies colluded. Most central to the Court's finding, based on the factors, is the suspicious timing of the assignments right after the initially alleged federal question jurisdiction appeared in jeopardy, the clear agreement between the parties to share in whatever recovery 3BTech might have received, the clear attorney overlap and potential to share litigation costs as part of any recovery, and 3BTech's apparent inability to provide any direct evidence of what the assignments entailed and what consideration was paid.

In addition to the factors, the Court also finds several of 3BTech's non-diversity related explanations for the assignments dubious based on the facts and evidence in this case. First, it is not clear how assigning the litigation rights to 3BTech streamlined costs of litigation (DE 13 ¶ 7) when DC 3B and 3BTech were already using the same attorneys to pursue $1.6 million of allegedly illicit transfers and the newly discovered wrongdoing involved a related company and only $233,000 in additional transfers. Second, it is not clear why the parties felt the assignments were necessary to recover unified damages when they intended to split those damages equitably amongst themselves in the end anyway. (*Id.* ¶¶ 7, 50.) Third, it is not clear how the assignments prevented infighting when all three companies still stand to benefit from the litigation through an

equitably distributed recovery (DE 13 ¶ 50) and thus would likely maintain some say in how the case proceeds. And finally, even taking the alleged reasons for the assignments at face value, it is not clear why, other than for the purpose of invoking diversity jurisdiction, the companies chose 3BTech, the only diverse company, as the one to which they assigned their claims when DC 3B was already involved in the litigation, had a larger connection to the underlying claims, and would have allowed the companies to still reap all the benefits they claim they got from assigning the litigation rights to 3BTech. (*Id.*) The Court thus concludes, based on its consideration of the totality of the circumstances, that 3BTech, DC 3B, and Hoverzon colluded to create diversity jurisdiction and that, pursuant to 28 U.S.C. § 1359 and Rule 12(b)(1), the Court must dismiss the remainder of the claims in this case for lack of jurisdiction.

**IV. Conclusion**

For those reasons, the Court, having already granted part of Jie Wang's motion to dismiss (DE 35) by dismissing 3BTech's federal claim (DE 64), now GRANTS the remainder of Ms. Wang's motion and dismisses 3BTech's non-federal claims without prejudice. The Clerk is DIRECTED to enter judgment accordingly. Further, in light of this order, 3BTech's pending Motion for Preliminary Injunction (DE 37), Motion for Protective Order (DE 48), Motion to Consolidate Cases (DE 66), and Motion to Expedite Plaintiff's Motion for Expedited Hearing on its Motion for Preliminary Injunction (DE 73) are DENIED as moot.

SO ORDERED.

ENTERED: April 20, 2021

/s/ JON E. DEGUILIO
Chief Judge
United States District Court